# United States Court of Appeals
## For the First Circuit

No. 21-1326

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT CORLETO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, <u>U.S. District Judge</u>]

Before

Kayatta, Lipez, and Howard,
<u>Circuit Judges</u>.

<u>Mark G. Miliotis</u>, with whom <u>Elliot M. Weinstein</u> was on brief, for appellant.
<u>Seth R. Aframe</u>, Assistant United States Attorney, with whom <u>John J. Farley</u>, United States Attorney, was on brief, for appellee.

December 28, 2022

**KAYATTA**, <u>Circuit Judge</u>.  After the district court denied Robert Corleto's motion to suppress evidence collected during the investigation that led to his arrest, he pled guilty to one count of sexual exploitation of a minor.  In so doing, he preserved his right to appeal the denial of his motion to suppress.  For the following reasons, we affirm the judgment of the district court.

## I.

For the purposes of this appeal, "[w]e recount the facts in the light most favorable to the district court's ruling on the motion to suppress, but only to the extent that they have support in the record and are not clearly erroneous."  <u>United States</u> v. <u>Dubose</u>, 579 F.3d 117, 120 (1st Cir. 2009) (quoting <u>United States</u> v. <u>Holloway</u>, 499 F.3d 114, 115 (1st Cir. 2007)).  Although Corleto takes issue with some of the district court's factual findings, he develops no argument that these findings were clearly erroneous.  Any such argument is thus waived.  <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

## A.

FBI Special Agent Timothy DeMann applied for a warrant to search Corleto's residence and any vehicles registered to that residence.  In his supporting affidavit, DeMann explained that on March 18, 2019, an undercover FBI task force officer used the KIK Messenger app to chat with a person ("the target") who claimed to use KIK to communicate with a "12 year-old slave" who did whatever

the target asked. The target ultimately connected the undercover agent and the purported minor in a live group chat, and the target directed the minor to send photos of herself in her underwear and, ultimately, proof of her masturbating. Asked by the undercover agent if he had past photos of the purported minor, the target sent an image showing nail polish that seemed to match that seen in the live chat images.

That same day, the FBI sent an emergency request to KIK seeking the subscriber identification and IP access information associated with the target's KIK username. KIK's responsive disclosures included IP addresses from March 16, 2019, through March 18, 2019, and indicated that the target was using an iPhone. The FBI focused on one frequently used IP address, which was assigned to Comcast. The FBI sent an emergency request to Comcast seeking subscriber information for that IP address. Comcast identified the subscriber as Nicole Corleto and provided the physical service address as a location on Elmwood Drive in Hudson, New Hampshire. Public records indicated that Robert Corleto resided there, and that a 2016 blue Chevy Equinox and a 2001 white Ford F150 were registered at that address to Nicole and Robert Corleto, respectively.

After relating this information, DeMann's affidavit described the likelihood that a "computer or storage medium" found at the Elmwood Drive address would contain contraband and/or

- 3 -

evidence of crimes, "[b]ased on [his] knowledge, training, and experience." Again invoking his "training and experience," DeMann asserted that the evidence he sought "is by its very nature portable" and may be stored on "extremely compact storage devices," including "smart phones," and that "it is not uncommon for individuals to keep such media in multiple locations within their premises, including in outbuildings and motor vehicles."

A magistrate judge issued a search and seizure warrant on March 19, 2019. As requested, the warrant authorized the search of the Elmwood Drive residence and "any vehicles registered to that address," including the F150 and the Equinox registered to Robert and Nicole Corleto, for, among other things, "records and visual depictions of minors engaged in sexually explicit conduct." The warrant also authorized the seizure of "[a]ny computer . . . that [was] or may have been used as a means to commit the offenses described on the warrant," employing a broad definition of "computer" that included smartphones.

**B.**

That same day, DeMann and other FBI agents executed the search warrant for the Elmwood Drive address. When the agents arrived, Robert Corleto and his wife Nicole were in the process of leaving the residence's parking lot in the Equinox. Without drawing his gun, DeMann stopped the Equinox and identified himself.

- 4 -

DeMann approached the SUV's passenger side -- where Robert Corleto was seated -- and asked him to exit the vehicle.

At the suppression hearing, DeMann expressed some uncertainty as to whether Corleto had the phone in his hand or in a pocket as he exited the car, ultimately concluding that it was in Corleto's hand.  Corleto agreed, and the district court so found.  After DeMann asked if Corleto could unlock the phone for him, Corleto opened his iPhone by pressing the "home" button and handed it to DeMann.[1]

After DeMann and Corleto moved away from the car, DeMann explained that they had a warrant to search for evidence of child pornography.  DeMann then stepped away for a few moments, back to the vehicle, until Corleto motioned him over.  Unprompted, Corleto informed DeMann that everything the officer sought was on his phone.

Agents nevertheless proceeded to execute the warrant by searching Corleto's residence.  At no point was Corleto handcuffed nor were any weapons drawn.  As the agents searched the home, Corleto reiterated to DeMann several times that his phone contained what the agents sought.  DeMann eventually suggested that they discuss things at the Hudson Police Department.  DeMann testified that he made that suggestion because the residence contained around

---

[1]  The phone did not have a passcode or biometric fingerprint lock.

ten agents plus the Corletos, "and everybody [was] walking around," there was "really no place to sit down," and DeMann "figured that the interview was going to have some sensitive . . . questions that I was going to be asking him." DeMann testified that, at the station, he "could sit down," "take notes," and "record the interview."

Corleto asked if he could take his truck, but it had yet to be searched. Instead, DeMann drove Corleto to the station with Corleto seated in the front seat of DeMann's car. Corleto was not handcuffed, and another agent sat in the backseat.

Corleto was interviewed in a room at the station. The interview was recorded in its entirety. The door was open during parts of the interview, and Corleto was told multiple times that he was free to leave.[2] Four different law enforcement officers, including DeMann, participated in various portions of the interview. Corleto admitted, among other things, that he solicited sexual photographs from a twelve-year-old girl and had similar interactions with a "handful" of others. In response to DeMann

---

[2] Near the start of the interview, DeMann told Corleto, "You are not under arrest. You are not in custody. At any point, if you want to leave, you're more than welcome. I'll drive you back to your house. No problem." About fifteen minutes later, during a round of questioning, DeMann again stated, "You're not in custody and you're free to go at any point, as we have explained." DeMann subsequently informed Corleto of this right once more during the interview.

- 6 -

asking whether there was "anything else you need to let us know," Corleto stated, "It's all right there on the phone."

When the interview ended, DeMann asked Corleto where he would like DeMann to drive him, and Corleto indicated that he wanted to go home.  DeMann drove him there, with Corleto again in the front seat.

In due course, a grand jury returned an indictment charging Corleto with one count of sexual exploitation of a minor, 18 U.S.C. § 2251(a), (e), and one count of transportation of child pornography, 18 U.S.C. § 2252A(a)(1), (b)(1).  Corleto moved to suppress the evidence obtained from the March 19 search, as well as the statements he made during the search and later at the station.  After holding an evidentiary hearing, the district court denied the motion.  Corleto then agreed with the government to plead guilty to sexual exploitation of a minor in exchange for the government dismissing the second count, though Corleto retained the right to appeal the denial of his suppression motion.  Corleto timely appealed on that basis.

## II.

"In reviewing the denial of a motion to suppress, we review the district court's . . . conclusions of law, including its ultimate constitutional determinations, de novo."  United States v. Merritt, 945 F.3d 578, 583 (1st Cir. 2019).  We will uphold the denial "as long as 'any reasonable view of the evidence

supports the decision.'" Id. (quoting United States v. Clark, 685 F.3d 72, 75 (1st Cir. 2012)).

Corleto advances an array of arguments on appeal. Invoking the Fourth Amendment, he argues that the warrant lacked sufficient nexus and particularity and that it was executed as an unlawful general warrant. He also insists that his iPhone's seizure exceeded the scope of the warrant; that he did not consensually surrender the phone; that the phone's seizure was not within the plain-view exception to the warrant requirement; and that the search of the iPhone was improper. Finally, he argues that the use of statements made by him violated his Fifth Amendment right against self-incrimination.

We begin with Corleto's challenges to the warrant itself, then examine his claims about its execution, and conclude with his Fifth Amendment argument.

**A.**

Corleto faults DeMann for obtaining the warrant by providing testimony about the general practices of those who possess child pornography, rather than specific information about Corleto's suspected activities. Corleto further insists that "there was insufficient guidance applied for and obtained to limit the scope of the potential seizures of smart phones." He broadly frames these challenges in terms of the warrant's failure to establish a nexus between the place to be searched and the alleged

- 8 -

criminal activity, and the warrant's lack of sufficient particularity.  We consider those challenges in turn.

**1.**

When evaluating a challenge to a warrant, "[w]e review a determination of probable cause de novo and look only to the '"facts and supported opinions" set out within the four corners of the affidavit.'"  United States v. Lindsey, 3 F.4th 32, 39 (1st Cir. 2021) (quoting United States v. Austin, 991 F.3d 51, 55 (1st Cir. 2021)).  A warrant application must show probable cause to believe both that "a crime has been committed" and that "enumerated evidence of the offense will be found at the place searched."  Id. (quoting United States v. Dixon, 787 F.3d 55, 59 (1st Cir. 2015)).  The latter condition, known as the "nexus" requirement, demands a "'fair probability' -- not certainty -- that evidence of a crime will be found in a particular location."  Id. (quoting Dixon, 787 F.3d at 60).  Nexus can be "inferred from the type of crime, the nature of the items sought, . . . and normal inferences as to where a criminal would hide [evidence of a crime]."  Id. (alterations in original) (quoting United States v. Rodrigue, 560 F.3d 29, 33 (1st Cir. 2009)).

Corleto's appellate brief invokes the nexus requirement in an argument heading, but then declines to mention it again in the substantive argument.  Any argument about this requirement is therefore likely waived.  See Zannino, 895 F.2d at 17.  But even

- 9 -

if we considered his claim that there was insufficient evidence linking the Elmwood Drive residence and associated vehicles to the commission of a crime, we would find it unavailing.

DeMann's affidavit described evidence that a KIK user had solicited and sent child pornography from an iPhone using an IP address affiliated with the Corleto residence. This amply supports the inference that one of the residents of the Elmwood Drive address used a portable smartphone to commit the stated crime and that there may have been evidence of this crime on such a phone at the specified address, which DeMann included in the definition of the premises to be searched.

DeMann then relied on his training and experience in child-pornography investigations to express the hardly surprising opinion that "it is not uncommon" for individuals with such contraband to store it on portable devices "in multiple locations within their premises, including . . . motor vehicles." Robert and Nicole Corleto had between them two personal vehicles registered to the Elmwood Drive residence, and the affidavit specifically included both vehicles in its definition of the premises to be searched. We have established beyond any doubt "the concept that a law enforcement officer's training and experience may yield insights that support a probable cause determination." United States v. Floyd, 740 F.3d 22, 35 (1st Cir. 2014) (collecting cases); see, e.g., United States v. Larson, 952

F.3d 20, 24 (1st Cir. 2020) (citing with approval a warrant affidavit's statement that based on "[the agent's] experience as an investigator concerned with [child pornography], those who seek the forbidden pornography tend to keep the examples they obtain"). Moreover, such an inference about the portable storage of contraband was particularly apt in this case, where law enforcement knew the target had already used a portable device to transmit saved images.

In light of the foregoing facts and inferences, there can be no serious question that the warrant's affidavit established a sufficient nexus between the criminal activity and the places to be searched.[3]  See United States v. Corleto, No. 19-cr-76-1, 2020 WL 406357, at *8 (D.N.H. Jan. 23, 2020) ("The chain connecting the KIK account to a Comcast IP address and the IP address to Corleto's residence could hardly be clearer.").

**2.**

Corleto devotes comparatively more ink to the warrant's purported failure to "particularly describ[e] the place to be

---

[3] Corleto also cites several cases concerning warrantless searches of cell phones and warrantless collection of location data for the proposition that a search of his phone occurred. See Carpenter v. United States, 138 S. Ct. 2206 (2018); Riley v. California, 573 U.S. 373 (2014).  But these opinions themselves have little in common with a case like this in which the government acknowledges that there was a search and obtained a warrant to seize the smartphone and search for, among other things, "records and visual depictions of minors engaged in sexually explicit conduct" and "information pertaining to KIK."

searched, and the persons or things to be seized."  U.S. Const. amend. IV.  This particularity requirement exists "to prevent wide-ranging general searches by the police."  United States v. Moss, 936 F.3d 52, 58 (1st Cir. 2019) (quoting United States v. Bonner, 808 F.2d 864, 866 (1st Cir. 1986)).  We have previously construed particularity as implicating two distinct demands.  See United States v. Upham, 168 F.3d 532, 535 (1st Cir. 1999).  "[A] valid warrant: (1) must supply enough information to guide and control the executing agent's judgment in selecting where to search and what to seize, and (2) cannot be too broad in the sense that it includes items that should not be seized."  Lindsey, 3 F.4th at 40 (quoting United States v. Kuc, 737 F.3d 129, 133 (1st Cir. 2013)).

The warrant here included two attachments, corresponding to the "premises to be searched" and the "items to be seized." Attachment A listed the Elmwood Drive address and its two affiliated vehicles as the "subject premises."  Attachment B described several categories of records sought that relate to child pornography, the use of KIK, and the occupancy of the Elmwood Drive address.  Attachment B included as search targets any computers that may have been used to commit the offense, listing several

further types of computer-specific evidence sought, and it defined "computer" to include "mobile 'smart' telephones."

Corleto argues generally that this warrant was defective, invoking the specter of colonial-era general warrants. But he fails to explain how the warrant obtained here failed to constrain the agents' discretion or was overly broad. At his most specific, he claims that the warrant failed the first prong of particularity in that it "did not provide enough guidance to the agents executing the [search]" because the iPhone ultimately seized "may have been either in his pocket or hand, or dropped on the ground." But Corleto invokes no authority for the implied proposition that a warrant affidavit need predict with omniscient precision exactly where on the premises the evidence to be seized may be located. And for good reason: The authority is to the contrary. See United States v. Banks, 556 F.3d 967, 973 (9th Cir. 2009) ("The prohibition of general searches is not . . . a demand for precise ex ante knowledge of the location and content of evidence." (quoting United States v. Meek, 366 F.3d 705, 716 (9th Cir. 2004))); United States v. Ross, 456 U.S. 798, 820–21 (1982) ("[A] warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found.").

To the extent Corleto intended his particularity argument to encompass the requirement's demand disfavoring

overbreadth, by contending that the warrant permitted the seizure of too wide a range of electronic devices (including his iPhone), we disagree.  In light of the evidence reported in the affidavit concerning the nature of the offense, the seizure and subsequent search of all such devices in the Corletos' residence and vehicles "was about the narrowest definable search and seizure reasonably likely to obtain the images."  Upham, 168 F.3d at 535 (upholding a warrant seeking "[a]ny and all computer software and hardware" in a child-pornography investigation); see also United States v. McLellan, 792 F.3d 200, 213-14 (1st Cir. 2015) (upholding a warrant to search the electronic devices of three roommates living in a single-family dwelling where evidence of child pornography was linked to an IP address shared by all residents).

Finally, Corleto also appears to argue that warrants targeting smartphones categorically require some greater standard of particularity than might otherwise be required.  But even were that so -- a matter we need not consider here -- this warrant was sufficiently particular to satisfy whatever heightened standard might reasonably apply to warrants targeting smartphones. Attachment B to the warrant affidavit specifically listed as an "item[] to be seized" "[a]ny computer or electronic media that were or may have been used as a means to commit the offenses

described on the warrant, including the production, receipt, possession, distribution, or transportation of child pornography."

**B.**

Corleto next insists that his iPhone's seizure exceeded the scope of the warrant for two separate reasons. He first contends that the warrant did not actually authorize agents to search the Corleto vehicles unless they were stationary and "located on the subject property." This contention simply mischaracterizes the warrant's parameters. As Corleto recognizes elsewhere in his brief, the warrant's Attachment A specifically stated that the "subject premises" to be searched "include the residential property" at the Elmwood Drive address, "as well as any vehicles registered to that address." It clarified that the "subject premises includes the following registered motor vehicles," listing the F150 and the Equinox with their registration numbers. The attachment thus contained no constraint on the location of the vehicles.[4]

---

[4] For the same reason, Corleto's corollary argument that Attachment A is ambiguous because the warrant affidavit's definitions section fails to define the words "subject," "premises," or "property" is unavailing. The entire function of the attachment is to define the term "subject premises," as that term is then used throughout the affidavit and warrant (to which the same attachment was appended). Relatedly, his assertion that "[t]he agents could not be certain as to the identities of the persons in the Equinox" is irrelevant, as the warrant permitted the search of the Equinox regardless of who was driving it.

- 15 -

Second, Corleto argues that the seizure of his phone necessarily required a search of his person that was not permitted by the warrant.  He invokes Supreme Court case law holding that a warrant to search a place does not automatically authorize the search of all persons found within.  See United States v. Di Re, 332 U.S. 581, 587 (1948); Ybarra v. Illinois, 444 U.S. 85, 91 (1979).  But regardless of whether the warrant here would have permitted a search of Corleto's person, the district court reasonably found that no such search occurred.  Rather, adopting Corleto's own testimony on the encounter, it found that Corleto was already holding the phone in his hand as he exited the Equinox.  Corleto further testified that the phone was within DeMann's view as Corleto got out of the car.[5]

---

[5]  Corleto separately asserts that he did not consensually surrender the phone.  But given the warrant authorizing the seizure of any smartphones "used as a means to commit the offenses," there was no need for Corleto's consent.  Additionally, Corleto arguably hints at an argument to the effect that the warrant did not authorize a search of the iPhone, even assuming that the iPhone's seizure was permissible.  Corleto did not raise this argument to the district court below, and he does not come close to properly developing it on appeal.  Even if we deemed it forfeited, rather than waived, and thus subject to plain error review, United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002), the argument still fails.  The warrant here authorized officers to search for records "in any form wherever they may be stored" relating to the relevant offenses, in addition to listing certain records -- such as "information pertaining to KIK" -- that were especially likely to exist on a smartphone.  See Upham, 168 F.3d at 535-36.

Finally, we turn to Corleto's argument that his statements to the agents should have been suppressed because he never received a Miranda warning. The only statement Corleto addresses with any specificity on appeal is his "commentary concerning the production of the iPhone." Accordingly, our review is limited to his interactions with agents prior to his offering that commentary.[6]

"It is well established that Miranda warnings must be communicated to a suspect before he is subjected to 'custodial interrogation.'" United States v. Li, 206 F.3d 78, 83 (1st Cir. 2000). "Both 'custody' and 'interrogation' must be present to require Miranda warnings." United States v. Molina-Gomez, 781 F.3d 13, 22 (1st Cir. 2015). "Interrogation" consists of "either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291 (1980), 300-01. "The 'functional equivalent' of questioning is 'any words or action on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" United

---

[6] Corleto's Fifth Amendment discussion fails to mention relevant aspects of his interview at the police station, including any other statements made at the station that he might have claimed should have been suppressed. We therefore deem any arguments regarding the statements at the station waived. See Zannino, 895 F.2d at 17.

States v. Davis, 773 F.3d 334, 339 (1st Cir. 2014) (omission in original) (quoting Innis, 446 U.S. at 301).

Here, Corleto volunteered at his residence without interrogation the very statements he now seeks to suppress. Even in the absence of a Miranda warning, "[v]olunteered statements of any kind are not barred." Miranda v. Arizona, 384 U.S. 436, 478 (1966). The district court properly found that Corleto's "commentary concerning the production of the iPhone" was admissible.[7]

**III.**

For the foregoing reasons, the judgment of the district court is affirmed.

---

[7] Not surprisingly, Corleto makes no argument that his repetition of these same statements at the station should be suppressed even if his statements at his residence are not suppressed.